No. 13-2464

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JOHN J. STRAUCH, JR. and
JASON ENDLICH

Plaintiffs-Appellants

v.

EXELON CORPORATION and
CONSTELLATION ENERGY GROUP'S SEVERANCE PLAN

Defendants-Appellees

On Appeal from the U.S. District Court for the
District of Maryland

## OPENING BRIEF OF APPELLANTS STRAUCH AND ENDLICH

Christopher G. Mackaronis
BRICKFIELD, BURCHETTE, RITTS
  & STONE, PC
1025 Thomas Jefferson Street, NW
Eighth Floor, West Tower
Washington, DC 20007
(202) 342-0800 (phone)
(202) 342-0807 (fax)

*Attorney for Appellants*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2464 _____     Caption: John J. Strauch, Jr. and Jason Endlich v. Exelon Corp. et al. _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

John J. Strauch, Jr. and Jason Endlich _____
(name of party/amicus)

_____

who is _____Appellants_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent
    corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                       ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____         Date:    December 10, 2013

Counsel for: Appellants Strauch and Endlich

## CERTIFICATE OF SERVICE
***************************

I certify that on  December 10, 2013  the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Azeez Hayne
David Gomez
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

_____                    December 10, 2013
(signature)                                 (date)

- 2 -

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................iii

TABLE OF AUTHORITIES.............................................................iv

SUBJECT MATTER AND JURISDICTION.......................................1

STATEMENT OF ISSUES..............................................................1

STATEMENT OF THE CASE ..........................................................1

STATEMENT OF FACTS ...............................................................6

SUMMARY OF ARGUMENT ........................................................10

ARGUMENT ............................................................................12

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
        JUDGMENT IN LIGHT OF THE LANGUAGE OF THE PLAN
        AND EVIDENCE FROM WHICH REASONABLE
        INFERENCES SHOULD HAVE BEEN DRAWN IN THE
        APPELLANTS' FAVOR ..................................................12

        A.    The Standard of Review.........................................12

        B.    The Unambiguous Definition of "Successor" Foreclosed
            Summary Judgment ..............................................13

        C.    Other Evidence Foreclosed Summary Judgment................19

    II.    THE APPELLANTS WERE ENTITLED TO DISCOVERY. ....22

CONCLUSION ..........................................................................24

REQUEST FOR ARGUMENT.........................................................25

CERTIFICATE OF COMPLIANCE...................................................26

CERTIFICATE OF SERVICE.........................................................27

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan*,
201 F.3d 335 (4th Cir. 2000) ........................................................................ passim

*Boyd v. Metropolitan Life Ins. Co.*, 636 F.3d 138 (4th Cir. 2011) .................... 15, 17

*Cardoza v. United Of Omaha Life Ins. Co.*, 708 F.3d 1196 (10th Cir. 2013) ........ 19

*Clark v. Unum Life Ins. Co.*, 799 F.Supp. 527 (D. Md. 2011) ................................ 26

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54 (4th Cir. 1992) ........................ 16

*Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) .................................. 16

*Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315
(4th Cir. 2008) ..................................................................................................... 17

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ........................ 15, 18

*Gay v. Wall*, 761 F.2d 175 (4th Cir. 1985) .............................................................. 25

*George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383 (4th Cir. 2009) ...... 13

*Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84 (4th Cir. 1996) .............................. 16

*Johnson v. American United Life Ins. Co.*, 716 F.3d 813 (4th Cir. 2013) ........ 18, 19

*Kennedy v. Plan Administrator for DuPont Savings and
Investment Plan*, 555 U.S. 285 (2009) ............................................................... 16

*Logar v. West Va. Bd. of Governors*, 493 Fed. Appx. 460 (4th Cir. 2012) ............ 25

*Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985) .................... 15

*Rutecki v. CSX Hotels, Inc.*, 290 Fed.Appx. 537 (4th Cir. 2008) .......................... 13

*Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983) ................................................... 15

*Solis v. Food Employers Labor Relations Assoc.*, 644 F.3d 221
(4th Cir. 2011) ...................................................................................................... 26

*Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157
(2003) ................................................................................................................... 19

*Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634 (4th Cir. 1995) ............................... 19

### Statutes

28 U.S.C. § 1291 ...................................................................................................... 1

28 U.S.C. § 1331 ...................................................................................................... 1

28 U.S.C. § 1332 ...................................................................................................... 1

29 U.S.C. § 1001 ...................................................................................................... 1

29 U.S.C.§1104(a)(1) ............................................................................................ 18

### Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 3

Fed. R. Civ. P. 12(d) .............................................................................................. 25

Fed. R. Civ. P. 56 ........................................................................................ 4, 24, 25

Fed. R. Civ. P. 56(d) .................................................................................... 4, 24, 25

## SUBJECT MATTER AND JURISDICTION

The Appellants' suit in the district court was filed pursuant to the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.

§ 1001. Subject matter was conferred on the district court by 28 U.S.C. §§ 1331

and 1332. Pursuant to 28 U.S.C. § 1291, this Court has appellate jurisdiction over

the final judgment of the district court dated November 19, 2013.

## STATEMENT OF ISSUES

1.    Did the district court err in granting summary judgment when the

decision of the Plan Administrator denying severance benefits was contrary to the

unambiguous language of the Severance Plan and inconsistent with prior

interpretations?

2.    Did the district court err by failing to draw reasonable factual

inferences in the Appellants' favor, particularly in light of the Plan Administrator's

conflict of interest?

3.    Did the district court err by failing to allow the Appellants discovery?

## STATEMENT OF THE CASE

This is an appeal from a district court order granting summary judgment to

Appellees Exelon Corporation ("Exelon") and Constellation Energy Group's

Severance Plan (the "Severance Plan") on the Appellants' claims that they were

wrongfully denied benefits under the Severance Plan in violation of the Employee

Retirement Income Security Act of 1974, as amended, ("ERISA") when their

employment was terminated.

Appellants John J. Strauch, Jr. ("Strauch") and Jason Endlich ("Endlich";

collectively the "Appellants") filed suit on May 28, 2013, in the Federal District

Court for the District of Maryland, Baltimore. (Joint Appendix 7 (hereinafter

"J.A.").) In their complaint, Appellants alleged that their employment was

involuntarily terminated within one year of a "change in control" that occurred

upon the merger of Exelon and Constellation Energy Group, Inc. in March 2012.

(J.A. 11). Subsequent to the merger, and as a condition of regulatory approval,

Exelon was required to divest itself of the facilities at which the Appellants were

employed. The divesture ultimately caused the termination of Appellants'

employment later in 2012. (J.A. 11). The Appellants alleged that under the terms

of the Severance Plan, employees "displaced" within one year of a "change in

control" were entitled to severance benefits so long as they were not offered

employment by a Successor employer. The Appellants alleged that Raven Power

Holdings, LLC, ("Raven Power") purchased the divested facilities and because

neither of them were offered employment by Raven Power, they were both entitled

to benefits under the Severance Plan. (J.A. 10, 11). The Appellants exhausted

their administrative appeals under the Severance Plan prior to filing suit. (J.A. 11-

12). The Plan Administrator's decisions denying benefits to Appellants found,

varyingly, that because their new employer had a "close relationship" or a "close

nexus" to Raven Power, it would be considered a "Successor" under the terms of

the Plan, thereby resulting in the denial of benefits. The Plan Administrator also

explained that benefits under the Plan were intended "to cover a period of

unemployment." (J.A. 113, 114).

In response to the Complaint, on August 5, 2013, Exelon and the Severance

Plan filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). (J.A. 4; Dkt. No.

13). In support of their motion to dismiss, Appellees filed five exhibits, including

the Severance Plan, excerpts of the Purchase and Sale Agreement between

Constellation Raven Power Holdings LLC and selected schedules, and excerpts of

the administrative appeals of the Appellants. (J.A. 4; Dkt. No. 14). Strauch and

Endlich opposed the motion (J.A. 4; Dkt. No. 17) after which the Appellees filed a

reply memorandum. (J.A. 5; Dkt. No. 22). On October 4, 2013, the district court

issued an Order converting the Appellees' motion to dismiss to a motion for

summary judgment under Fed. R. Civ. P. 56, and giving "[t]he parties . . . until

October 17, 2013 to present to the Court any materials that are pertinent to the

motion." (J.A. 97). On October 17, 2013, Appellants filed an opposition to

summary judgment, accompanied by an affidavit from Appellant Strauch, and the

- 3 -

Affidavit of Christopher G. Mackaronis in support of Appellants' alternative request for discovery under Fed. R. Civ. P. 56(d).  (J.A. 5; Dkt. No. 24; J.A. 99, 115).

The district court issued its memorandum opinion on November 19, 2013, granting summary judgment to the Appellees.  (J.A. 118).  The district court found that the Severance Plan granted the Plan Administrator "the *exclusive right* to grant or deny benefits and interpret the terms of the plan."  (J.A. 122)(emphasis in original).  In determining whether the challenged severance benefit denials were reasonable, the district court cited the factors enumerated in *Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000).  (J.A. 121).  Those factors included "(1) the language of the plan;" . . . (4) consistency "with other provisions in the plan and with earlier interpretations of the plan;. . . and (8) the fiduciary's motives and any conflict of interest it may have."  (J.A. 121)(quoting *Booth,*201 F.3d at 342-43).  In opposing summary judgment, the Appellants argued that the Plan Administrator is bound by the Severance Plan's unambiguous definition of "Successor," which is "any employer who purchases an Employer subsidiary/affiliate either through a stock or asset purchase."  (J. A. 5; Dkt. No. 24, at 9-11; J.A. 22).  According to the Appellants, since they were not offered employment by the Successor, they were entitled to

severance benefits as *Booth* holds that a Plan Administrator cannot contravene the terms of the Plan. (*Id.* at 10).

The district court ruled, however, that the "plan documents rule" was "inapposite to the present case." (J.A. 122). Instead, the district court found that "[t]he plan document rule does not remove a plan administrator's discretionary authority to construe terms *within the plan documents themselves.*" (J.A. 123)(emphasis in original). Applying the factors in *Booth*, the district court found that the challenged benefit denials were reasonable, and consistent with the "language used in the definition of a 'Successor' and with other provisions in the Service (sic) Plan." (J.A. 123-24). The district court also rejected the Appellants' argument that the denial of benefits to the Appellants was inconsistent with a recent prior application of the same terms of the Severance Plan, in which forty-three displaced employees were awarded severance benefits because they were not offered employment by a Successor, even though they continued working at the same facilities and did not experience a day of unemployment. (J.A. 125). Finally, although the district court agreed that the Plan Administrator "was operating under a conflict of interest as an employee of Exelon," (J.A. 125), it ruled that "the existence of such a conflict, alone, will not displace the countervailing reasonableness of the Plan Administrator's denial of benefits," (J.A. 126), and further ruled that the Appellants had "raised no evidence demonstrating that the

- 5 -

Plan Administrator was incapable of fairly evaluating claims for benefits." (J.A. 126). The district court did not address the Appellants' alternative argument that they were entitled to discovery prior to the entry of summary judgment. (J.A. 5; Dkt. No. 24 at 15-17).

The district court entered judgment for the Appellees on November 19, 2013, (J.A. 128), and the Appellants timely filed a notice of appeal on December 4, 2013. (J.A. 129).

## STATEMENT OF FACTS

Both of the Appellants were long service employees of Constellation Energy Group, Inc. ("Constellation"). Appellant Strauch began continuous employment with Constellation in 1982, while appellant Endlich was hired in 2004. (J.A. 9). When Exelon and Constellation merged in March 2012, the Appellants remained employed until November 30, 2012, when their employment was involuntarily terminated. (J.A. 9, 11). As a condition of the merger, Exelon was required to divest the electric generating facilities which the Appellants supported. (J.A. 8, 11, 118). When the sale of those facilities to Raven Power Holdings, LLC, ("Raven Power") was completed, the Appellants lost their jobs on November 30, 2012. (J.A. 11, 118).

It was undisputed on summary judgment that the Appellants "were covered by the Constellation Energy Group's Service (sic) Plan." (J.A. 119). The

Severance Plan applied to individuals "employed by an Employer" (J.A. 20).  The

term "Employer" was defined in the Plan as the "Constellation Energy Group and

any subsidiary/affiliate . . . as set forth in Appendix A."  (J.A. 20).  Appendix A, in

turn, identifies each of the "Constellation Energy Group Subsidiaries" whose

employees are participants in the Severance Plan.  (J.A. 35).

The Severance Plan provides benefits to covered employees who are

terminated ("displaced") as a result of a "Change in Control."  (J.A. 24, 119).  The

Severance Plan makes certain individuals ineligible for benefits, however,

including certain classifications of employees (e.g. part-time, temporary, and

employees terminated for cause) as well as "Employees who are offered any

position with a Successor. . . ."  (J.A. 22-23).  Article 1Y of the Severance Plan

defines a Successor as follows:  "<u>Successor</u> means any employer who purchases an

Employer subsidiary/affiliate either through a stock or asset purchase."  (J.A. 22).

The parties did not dispute, and the district court found, that the facilities the

Appellants supported were sold to Raven Power.  (J.A. 118).

The Purchase and Sale Agreement (the "Purchase Agreement") between

Constellation and Raven Power contained provisions which ensured that Exelon

would avoid liability for benefits under the Severance Plan for all but a handful of

employees supporting the purchased facilities.  Section 5.9 of the Purchase

Agreement obligated Raven Power to offer employment to each "Seller

- 7 -

Employee." (J.A. 49). The employment "shall continue for at least two years thereafter," (J.A. 50), and was to be with salary and benefits "at least as favorable" as the individuals received prior to the sale. (J.A. 51). There were 415 "Seller Employees," each identified by name and position in Schedule 3.18 of the Purchase Agreement. (J.A. 59-72). Since Raven Power was purchasing the assets of the facilities, it was a "Successor" as defined by the Severance Plan, (J.A. 22), and the contractual obligation that Raven Power offer employment to the 415 displaced employees absolved Exelon of any obligation to pay benefits under the Severance Plan.

In contrast, the Purchase Agreement identified six (6) "Off-Site Employees," including Appellants Strauch and Endlich. (J.A. 73-74). The Purchase Agreement did not obligate Raven Power to offer employment to the "Off-Site Employees." (J.A. 49)("each Off-Site Employee that it wishes to offer employment"). Neither of the Appellants were offered any position with Raven Power. (J.A. 11). Both Appellants were offered, and accepted, offers of "at will" employment by Topaz Power Management, which "is under contract to manage the assets owned by Raven Power." (J.A. 100). The employee benefits provided to the Appellants by Topaz Power "are not comparable" to the benefits they had received from Exelon. (J.A. 100).

The Appellants filed claims for benefits under the Severance Plan. (J.A. 11-12). Both claims were denied by letters dated March 11, 2013, from Plan Administrator Amy E. Best, the Senior Vice President and Chief Human Resources Officer of Exelon. (J.A. 113, 114). The Plan Administrator found that the distinction between Raven Power and Topaz was "one of form over substance." *Id.* The Plan Administrator concluded that the Appellants' employment offers from Topaz constituted offers of employment by a "Successor," thereby making them ineligible for severance benefits. As the Plan Administrator explained to Appellant Strauch, "I find that there is a *close nexus* between the two entities such that we consider your employer to be a successor." (J.A. 113)(emphasis added). The denial letter to Appellant Endlich was different: "I find that there is a *close relationship* between the two entities such that we consider your employer to be a successor." (J.A. 114) (emphasis added). As an additional rationale for the denials, the letters explained that "[t]he intent of Constellation Energy Group's Severance Plan was to provide pay continuation for employees whose jobs are eliminated *and to cover a period of unemployment.*" (J.A. 113, 114)(emphasis added). The Severance Plan, however, does not condition the receipt of benefits on a period of unemployment, nor does the Plan does not track periods of unemployment or address unemployment in any manner. (J.A. 102).

Although the Plan Administrator explained her decision denying benefits to the Appellants on the ground that they did not experience "a period of unemployment," (J.A. 113, 114), less than a year earlier "change in control" severance benefits were paid to forty-three (43) displaced employees who had worked for Constellation Operating Services, Inc. ("COSI"), (J.A. 35; identifying COSI employees as participants in the Severance Plan), "because their new employer, Olympus Power, had not purchased any stock or assets and was not, therefore, a successor under the Plan." (J.A. 102). Like the Appellants, the COSI employees did not experience a period of unemployment. (J.A. 102).

## SUMMARY OF ARGUMENT

The determinative issue on summary judgment was whether there was evidence from which to conclude or reasonably infer that the denial of benefits to the Appellants was an abuse of discretion by the Plan Administrator. The district court erred in concluding there was not.

The plain language of the Plan defines a "Successor" as "any employer who purchases an Employer subsidiary/affiliate either through a stock or asset purchase." (J.A. 22). Under the Court's holding in *Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), an ERISA fiduciary has no authority to contravene the terms of a plan. Relying on a grant of discretion in the Severance Plan, however, the district court in this case mistakenly

concluded that the Plan Administrator can "interpret" the terms of the Plan, even

when the terms are unambiguous. Consequently, the district court deferred to the

Plan Administrator's decision to effectively rewrite the Plan's definition of

Successor to include "any employer who purchases an Employer

subsidiary/affiliate *and any other employer with a close relationship or close nexus*

*to that employer*." The district court's error was compounded by a complete

absence in the Plan and the summary judgment record of evidence regarding the

source, meaning, applicability and usage of the apparently novel "close

relationship" and "close nexus" rationales given by the Plan Administrator.

Although no discovery had taken place, the district court also erred in failing

to draw all reasonable inferences in the Appellants' favor from the modest

evidence that was before the court. In explaining her decision to deny benefits, the

Plan Administrator reasoned that "[t]he intent of Constellation Energy Group's

Severance Plan was to provide pay continuation for employees whose jobs are

eliminated *and to cover a period of unemployment*." (J.A. 113, 114)(emphasis

added). But the Plan says nothing about unemployment, and proof suggested that

the Plan does nothing to track unemployment. The district court was obligated to

draw all reasonable inferences in the Appellants' favor from this proof, but instead

did not address this argument.

Other proof demonstrated that dozens of displaced employees had earlier
received severance benefits under the Plan even though, like the Appellants, they
had not experienced a period of unemployment.   And there was proof that those
same displaced employees received "change in control" severance benefits
because, like the Appellants, they had not been offered employment by a
"Successor," but nevertheless continued supporting the same facilities after their
terminations.  The district court should have inferred from this proof that the Plan
Administrator was not honoring her fiduciary obligations under ERISA to act
solely in the interest of the participants and beneficiaries, especially in light of the
Plan Administrator's conflict of interest.

Finally, the district court erred in not allowing any discovery requested by
the Appellants that was intended to explore the novel rationales offered by the Plan
Administrator to justify the benefit denials.

## ARGUMENT

I.     THE DISTRICT COURT ERRED IN GRANTING SUMMARY
       JUDGMENT IN LIGHT OF THE LANGUAGE OF THE PLAN AND
       EVIDENCE FROM WHICH REASONABLE INFERENCES SHOULD
       HAVE BEEN DRAWN IN THE APPELLANTS' FAVOR

       A.     The Standard of Review.

The Court reviews the district court's order granting summary judgment

under the *de novo* standard.  *Rutecki v. CSX Hotels, Inc.*, 290 Fed.Appx. 537, 539

(4th Cir. 2008).  The Court, in its review, must view the evidence presented in the

- 12 -

light most favorable to the non-moving party. *Id.* Moreover, the Court must draw all reasonable inferences in favor of the non-moving party. *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383,392 (4th Cir. 2009).

B.     The Unambiguous Definition of "Successor" Foreclosed Summary Judgment.

It was undisputed that unless the Appellants were offered employment by a "Successor," they were eligible for benefits under the Severance Plan. The Plan defines a Successor as "any employer who purchases an Employer subsidiary/affiliate through a stock or asset purchase." (J.A. 22). Raven Power, as the only purchaser, was the only Successor here (J.A. 11 at ¶11), and because Raven Power did not offer employment to the Appellants, the plain language of the plan entitled them to benefits.

In the decisions denying benefits, the Plan Administrator acknowledged that under the language of the Plan, Topaz Power was not a Successor. (J.A. 113, 114; "I find the distinction to be one of form over substance.").[1] The Plan Administrator nevertheless denied benefits, claiming in one instance there was a "close nexus" between the Appellants' new employer and the Successor, (J.A.

---

[1]     In the very least, the district court should have reasonably inferred from the "form over substance" comment that a strict or literal reading of the Plan indicated that Raven was the only "Successor."

113), and in the other that there was a "close relationship" between the two. (J.A. 114). Neither of these ambiguous terms can be found in the Plan, and nothing in the summary judgment record explains the source of these terms, any prior use, their limitations or applicability.[2] Believing that the Plan Administrator had "the exclusive right" to interpret any of the terms of the Plan – even unambiguous ones – the district court found that the denial of benefits was reasonable. (J.A. 122, 123). The district court erred in allowing the Plan Administrator to deviate from the Plan's unambiguous definition of Successor.

The Supreme Court has held that the written terms of the Plan are of paramount importance. "ERISA was enacted to 'promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits.'" *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983) and M*assachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)). "Congress identified the need to follow plan documents as a 'core principle[ ]' of the act." *Boyd v. Metropolitan Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011).

> ERISA requires "[e]very employee benefit plan [to] be established and maintained pursuant to a written instrument," 29 U.S.C.§ 1102(a)(1), "specify[ing] the basis on which payments are made to

---

[2]      The district court did not address these terms, and instead chose to describe Topaz as "an affiliate of Raven Power." (J.A. 119).

and from the plan," § 1102(b)(4)." *The plan administrator is obliged to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] and [Title IV] of [ERISA]," §1104(a)(1)(D), and ERISA provides no exemption from this duty when it comes time to pay benefits.*

*Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S.

285, 300 (2009) (emphasis added); *accord Curtis-Wright Corp. v. Schoonejongen*,

514 U.S. 73, 83 (1995) (noting that ERISA's statutory scheme "is built around

reliance on the face of written plan documents").

> While a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan.

*Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992).[3]

Consistent with longstanding Supreme Court precedent, this Court has

confirmed that a Plan Administrator has *no discretion* to act in conflict with the

Plan, earlier plan interpretations, or the interests of Plan beneficiaries.

> The Plan does not authorize its administrator to make determinations that are contrary to the plain language of the plan; that frustrate the purposes and goals of the plan; that are inconsistent with other provisions or earlier interpretations of the Plan; . . . or that are made in furtherance of an interest that conflicts with that of the Plan beneficiaries.

---

[3] ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996).

*Booth*, 201 F.3d at 343-44 (4th Cir. 2000); *accord Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) ("we require ERISA administrator's decisions to adhere both to the text of ERISA and the plan to which they have contracted."). Plan administrators look solely at the "directives of the plan documents" in determining how to disburse benefits. *Boyd*, 636 F.3d at 140. As this Court has noted, "ERISA requires plan administrators to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," and to do so 'for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and . . . defraying reasonable expenses of administering the plan.'" *Id.* at 140 (quoting 29 U.S.C. §1104(a)(1)).

Here, the unambiguous definition of Successor should have resulted in the denial of summary judgment. The terms of the Plan obligate Appellees to pay severance benefits to employees terminated within one year of a change in control who are not "offered any position with a Successor." (J.A. 22-23 at Article 2B). The Plan explicitly *defines* a Successor as "any employer who purchases an Employer subsidiary/affiliate either *through a stock or asset purchase*." *Id.*, Article 1Y at 5 (emphasis added). Principles of contract law require the enforcement of an ERISA plan "according to 'the plan's plain language in its ordinary sense,' that is, according to the 'literal and natural meaning' of the Plan's language." *Johnson v. American United Life Ins. Co.*, 716 F.3d 813, 819-20 (4th

- 16 -

Cir. 2013) (citations omitted).  "Courts should determine 'the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words.'"  *Id.* at 820 (quoting *Cardoza v. United Of Omaha Life Ins. Co.*, 708 F.3d 1196, 1203 (10th Cir. 2013).[4]

The district court's analysis was flawed in several respects.  The court found that "[t]he Plan Administrator interpreted the term 'Successor' to include the direct purchaser, Raven Power, *and its affiliates*, including Topaz."  (J.A. 124)(emphasis added).  But the district court's insertion of the word "affiliate" has no basis in the Plan, the Plan Administrator's decisions denying benefits, or the record in this case.  (J.A. 113, 114).  The district court's apparent source of the phrase was the Severance Plan's unrelated definition of the term "Employer," which "means Constellation Energy Group and any subsidiary/affiliate of the Constellation Energy Group designated by the SHRO, as set forth in Appendix A."  (J.A. 23).  Appendix A identifies the "Constellation Energy Group Subsidiaries" whose

---

[4]    The Court in *Johnson* indicated that in applying federal common law rules of contract interpretation when construing an ERISA plan, courts should "look to 'principles of state common law to guide'" their analysis. *Johnson, supra.*, 716 F.3d at 819 (quoting *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995)).  Under Maryland law, "[w]hen the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003).

employees are eligible to participate in the Plan. (J.A. 35). "Employer" is term of

art under the Plan, and defines the scope of employee participation.

In mistaken reliance on the definition of "Employer," the district court

reasoned that "the term 'Successor' may be interpreted by reading the word

'employer,' within the definition of a 'Successor,' consistently with the definition

of 'Employer' elsewhere in the Service (sic) Plan." (J.A.124). This was error, for

several reasons. First, because the Plan Administrator never used the word

"affiliate," and did not invoke the definition of "Employer" to justify her denials,

the district court's conjecture about this possible rationale was legally irrelevant.

More important, it was a mistake of contract interpretation for the district court to

conflate the term of art "Employer" with the Plan's use of the phrase "employer"

to define a "Successor." As defined in the Plan, "Employer" serves the essential

purpose of defining the Plan participants, i.e. all individuals working for

Constellation Energy Group or any of the subsidiaries identified in Appendix A.

(J. A. 20, 35).[5] That specialized definition has no logical relationship to the

generic use of the term "employer" in defining a Successor as "any employer who

purchases an Employer subsidiary/affiliate either through a stock or asset

---

[5]      In effect, the Plan defines Constellation and all of the enumerated
subsidiaries in Appendix A as part of a single employer, perhaps in recognition of
ERISA's provisions about "controlled groups." But the district court erred in
suggesting that the "controlled group" concept governs the Plan's definition of a
"Successor." (J.A. 124).

purchase." (J.A. 22). In fact, the use of the two distinct phrases in the same definition ("employer" and "Employer subsidiary/affiliate") gives rise to a strong inference that they have different – not identical -- meanings. The district court's failure to draw that inference in the Appellants' favor on summary judgment compounded its mistake of ignoring the plain language of the Plan.

C.    Other Evidence Foreclosed Summary Judgment.

On summary judgment, the district court was obligated to draw all reasonable inferences in favor of the non-moving parties -- the Appellants. The district court's failure to do so was error.

In concluding that Topaz was an "affiliate" of Raven and was, therefore, a Successor under the Plan, the district court lost sight of its obligation to focus on the rationale offered by the Plan Administrator for her denials. In the one instance, the Plan Administrator claimed that Topaz had a "close nexus" to Raven (J.A. 113) and in the other she found there was a "close relationship." (J.A. 114). Neither of these ambiguous terms appear anywhere in the Plan, and nothing in denial letters – or the entire summary judgment record -- explains the source of these two terms, any prior use, or their limitations and applicability. Indeed, the Plan Administrator's characterization of the difference between the Successor (Raven) and Topaz to be one of "form over substance" (J.A. 113, 114) should be interpreted as a concession about the plain language of the Plan. A reasonable inference to

draw in the Appellants' favor from these facts is that the "close nexus" and "close relationship" explanations provided an impromptu and unreasonable basis upon which to deny benefits. Indeed, the inference that the decision was unreasonable is measurably strengthened by the Plan Administrator's conflict of interest. (J.A. 125).

Similarly, on summary judgment the Appellants challenged the articulated rationale of the Plan Administrator that the "intent" of the Plan "was to provide pay continuation for employees whose jobs are eliminated *and to cover a period of unemployment.*" (J.A. 113, 114)(emphasis added). There is nothing in the Plan that describes its "intent," and there is no provision in the Plan that conditions severance benefits on a "period of unemployment." Indeed, the Affidavit of Appellant Strauch established that "[t]he Plan itself does not track the periods of unemployment experienced by employees entitled to severance pay." (J.A. 102). These facts alone support an inference that the purported rationale of a "period of unemployment" was a pretext to deny benefits to the Appellants. That inference is further strengthened by proof that the Plan Administrator had earlier awarded "change in control" severance benefits to forty-three (43) employees who were terminated, were not hired by a Successor, continued to operate and support the same facilities, and did not experience a period of unemployment. (J.A. 101-102). As this Court said in *Booth*, "[t]he Plan does not authorize its administrator to

- 20 -

make determinations . . .that are inconsistent with other provisions or *earlier interpretations of the Plan*." *Booth,* 201 F.3d at 343 (emphasis added). The district court did not address the inconsistency between the articulated rationale – "to cover a period of unemployment" – with the prior occasion in which change in control benefits were paid notwithstanding continuous employment. From that inconsistency, the district court should have inferred that the Plan Administrator had abused her discretion.

Cumulatively, the district court faced the following evidence on summary judgment: (a) a statement by the Plan Administrator that the distinction between Raven and Topaz was "form over substance;" (b) benefit denials based on two unexplained (and different) rationales why an employer who had not purchased any assets was, nevertheless, a Successor because of a "close nexus" or a "close relationship" to the Successor; (c) a complete absence in the Plan of any reference to the "close nexus" or "close relationship" standard; (d) unrebutted evidence that the only relationship between the actual Successor and Topaz was contractual; (e) the rationale of the Plan Administrator that the "intent" of the plan was to "cover a period of unemployment" but no mention whatsoever of "unemployment" in the Plan itself and unrebutted proof that the Plan does not track periods of unemployment; (f) proof that the Plan recently awarded "change in control" severance to dozens of employees who were terminated from their jobs and

- 21 -

immediately hired, with no period of unemployment, to perform substantially

identical work by an employer who did not purchase any assets; and (g) a Plan

Administrator with a conflict of interest.  From all this, a reasonable inference is

that the Plan Administrator abused her discretion in denying benefits.  The district

court's failure to draw that inference and deny summary judgment was error.

II.    THE APPELLANTS WERE ENTITLED TO DISCOVERY.

On October 4, 2013, the district court, sua sponte, entered a paperless order

converting the Appellees' motion to dismiss to a motion for summary judgment

under Fed. R. Civ. P. 56. (J.A. 97).  The order gave the parties until "October 17,

2013 to present to the Court any materials that are pertinent to the motion."  In

their October 17, 2013, opposition to summary judgment, the Appellants asked

alternatively for discovery pursuant to Fed. R. Civ. P. 56(d).  (J.A. 5, Dkt. No. 24

at 15-17).  The district court's failure to grant the request was error.

When the Court converted the defendants' motion to dismiss to a motion for

summary judgment under Fed. R. Civ. P. 56, "[a]ll parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion."

Fed. R. Civ. P. 12(d).  This Court has held that "the term reasonable opportunity

requires that all parties be given some indication by the court that it is treating the

12(b)(6) motion as a motion for summary judgment, with the consequent right in

the opposing party to file counter affidavits or pursue reasonable discovery."

*Logar v. West Va. Bd. of Governors*, 493 Fed. Appx. 460, 461 (4th Cir. 2012)

(quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)).

In the event that the Plan's definition of "Successor" was found to be

ambiguous, there were numerous issues for which discovery under Fed. R. Civ. P.

56(d) was appropriate before the district court could enter summary judgment.  As

the Strauch Affidavit revealed (J.A. 101, 102), a previous interpretation of the Plan

awarded change in control severance benefits to 43 terminated employees because

their new employer did not purchase any stock or assets and, consequently, was not

a Successor under the Plan.  Like the Appellants, those employees did not

experience a period of unemployment.  The Appellants were entitled to discovery

on all circumstances in which change in control severance benefits were paid,

including discovery on any legal advice given to the Plan Administrator regarding

her decisions in this or related matters where legal advice was provided to the Plan

regarding the meaning and interpretation of the term "Successor."  *See e.g. Solis v.*

*Food Employers Labor Relations Assoc.*, 644 F.3d 221, 228 (4th Cir. 2011) ("the

fiduciary exception to attorney-client privilege extends to communications

between an ERISA trustee and a plan attorney regarding plan administration.").

Appellants were also entitled to discovery on whether, and to what degree, the

obligation to pay severance was addressed or decided by the Appellees during the

merger discussions and negotiations.  And each of these categories of discovery is

appropriate to determine the extent to which the Administrator's apparent conflict of interest influenced her novel interpretation of the Plan here. *Clark v. Unum Life Ins. Co.*, 799 F.Supp. 527, 533 (D. Md. 2011).

Similarly, the Appellants were entitled to discovery on the novel "close relationship" and "close nexus" terms relied upon by the Plan Administrator. These unexplained terms raised obvious questions about their meaning, source and prior applicability. Discovery was also appropriate on the Plan Administrator's rationale that the "intent" of the Plan was to "cover a period of unemployment." Especially because there is no source in the Plan for that explanation, discovery was necessary here to explore if the "period of unemployment" explanation was merely a pretext for the denial of benefits to the Appellants.

## **CONCLUSION**

For the foregoing reasons, Appellants Strauch and Endlich respectfully request that the Court reverse the judgment of the district court.

- 24 -

## REQUEST FOR ARGUMENT

Appellants Strauch and Endlich respectfully request the opportunity to

present oral argument to the Court.

Respectfully Submitted,

//s//Christopher G. Mackaronis
Christopher G. Mackaronis
BRICKFIELD, BURCHETTE,   RITTS
    & STONE, PC
1025 Thomas Jefferson Street, NW
Eighth Floor, West Tower
Washington, DC 20007
(202) 342-0800 (phone)
(202) 342-0807 (fax)

*Attorney for Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2464        **Caption:** John J. Strauch, Jr. and Jason Endlich v. Exelon Corp. et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑ this brief contains _____ 5,541 _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2007 _____ [*identify word processing program*] in
Times New Roman, 14 PT _____ [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Christopher G. Mackaronis _____

Attorney for Appellee _____

Dated: 1/15/14 _____

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 15, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Azeez Hayne
Andrew Salkallaris
Elisa McEnroe
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA  19103

| | |
|---|---|
| //s//Christopher G. Mackaronis | January 15, 2014 |
| Signature | Date |